**BAUGH FARMS, INC., Plaintiff,**

v.

**Charles H. SMITH et al., Defendants.**

**Daniel SEBOURN, Plaintiff,**

v.

**Charles H. SMITH et al., Defendants.**

**Harry Lynn BAUGH, Plaintiff,**

v.

**Charles H. SMITH et al., Defendants.**

**Nos. GC 75–26–S, GC 75–27–S and GC 75–8–S.**

United States District Court,
N. D. Mississippi,
Greenville Division.

April 10, 1980.

James Robertshaw, Robertshaw & Merideth, Greenville, Miss., H. Clay Moore, Little Rock, Ark., for defendants.

## MEMORANDUM OF DECISION

ORMA R. SMITH, *District Judge.*

The actions sub judice have been submitted for final decision after a non-jury trial. The parties have furnished extensive post-trial proposed findings of fact and conclusions of law. Oral arguments of counsel have been received. Based upon the pleadings, evidence introduced at trial, the record made in each of the above-captioned actions and other submissions by the parties, this Memorandum of Decision is released and contains the findings of fact and conclusions of law required by Rule 52(a), Fed.R. Civ.P.

## I.  FINDINGS OF FACT

A.  *The Parties.*

This action is a consolidated action of three separate actions commenced by Baugh Farms, Inc., Harry Lynn Baugh and Daniel Sebourn against Southern Seed Service, a partnership composed of Charles H. Smith and his son, Charles F. Smith. James R. Baugh was made a party by defendants and the parties have stipulated that Baugh Farms, Inc. and James R. Baugh are to be considered as one and the same person for the purpose of this action.[1] Originally, the wives of Charles H. Smith and Charles F. Smith were joined as parties defendant as alleged partners in Southern Seed but they were dismissed with prejudice on motion for summary judgment.

B.  *Residence of the Parties.*

Plaintiffs are citizens of Arkansas and resident rice farmers in Southeast Arkansas whose rice farms, in 1974, were located

Taylor Webb, Webb & Webb, Leland, Miss., James M. Barker, Jr., Hamburg, Ark., for plaintiffs.

1. When making reference herein to the plaintiffs, the court will refer to James R. Baugh/Baugh Farms, Inc., as "James Baugh"; to Harry Lynn Baugh as "Harry Baugh"; and to Daniel Sebourn as "Sebourn". When making reference to defendants, the court may refer to the partners, Charles H. Smith and Charles F. Smith, by name, or jointly as "Southern Seed".

across the Mississippi River from the place of business of Southern Seed Service in Greenville, Washington County, Mississippi.

Defendants are resident citizens of Greenville, Washington County, Mississippi. They operate a grain facility for the drying and storage of rice and related seed business in Greenville.

### C. *Jurisdiction.*

The court has jurisdiction of the actions sub judice pursuant to the provisions of 28 U.S.C. § 1332(a). There is complete diversity between the parties, the plaintiffs being residents and citizens of Arkansas and defendants being residents and citizens of Mississippi. The matter in controversy in each action exceeds the sum or value of $10,000 exclusive of interest and costs.

### D. *The Litigation.*

In the 1974 crop year, Southern Seed operated a drying and storage facility for processing rice planted, cultivated and harvested in its trade area. In the 1973 crop year, Southern Seed did not dry or store any mill rice and the only rice received by it for drying or storage that crop year was the seed rice of James Baugh.

Over a period of time prior to the crop year 1974, Southern Seed and/or Charles H. Smith had a course of dealings with James Baugh under which fields certified for seed production were certified in the former's name. James Baugh would be credited with an agreed price per bushel for seed. Charles H. Smith would process the rice and sell it as seed, crediting or paying James Baugh after the sale had been consummated. For the 1974 growing season, this arrangement remained in effect.

The first crop year during which Southern Seed operated its grain facility in Greenville, was the crop year 1974, the period involved in this litigation. At one point, prior to acquisition, Southern Seed and James Baugh had considered the purchase of the facility jointly, but James Baugh was primarily interested in a rice warehousing business. The joint venture did not materialize, but James Baugh was thoroughly familiar with the processing capabilities of the facility.

James Baugh and the other parties plaintiff knew that the Southern Seed's drying facility at Greenville was a continuous flow-type common in industry.

The rice received by Southern Seed for drying and storage at the Greenville facility during the 1974 crop year, was produced for the most part by plaintiffs, between whom there existed a close relationship. James Baugh and Harry Baugh are brothers. Sebourn was a tenant of James Baugh during the year in question, and James Baugh was entitled to one-half of the Sebourn rice under their rental agreement.

The only other producer who brought any sizeable quantity of rice to the facility during the 1974 crop year was Steven Cockerhan, who was a neighbor and close friend of James Baugh, and who relied heavily on the advice of James Baugh on rice operations. Cockerhan was made a party defendant to the counterclaim which was filed herein by Southern Seed upon the theory that Cockerhan had entered into a conspiracy with the plaintiffs to injure Southern Seed's business. The Cockerhan claim, however, has been settled and has no significance to the action at the present time.

The number of bushels of rice delivered to Southern Seed in the Fall of 1974 and involved in this controversy, are as follows:

1. James Baugh delivered 128,650.7 bushels green weight of which 103,007.9 bushels were produced from fields certified for the production of Certified Bonnet No. 73 seed rice, the balance of 25,642.8 bushels consisted of mill rice;

2. Harry Baugh delivered 47,729.3 bushels green weight of mill rice; and

3. Sebourn delivered 36,200.3 bushels green weight of mill rice.

During the 1974 crop year, the only other rice dried or stored by Southern Seed, was as follows:

1. Steven Cockerhan—56,388.4 bushels green weight of rice;

2. Earl Teague—9,152.5 bushels green weight of rice; and

3. All other parties—486.4 (approximately) bushels green weight of rice.

It is shown for all practical purposes that Southern Seed devoted its entire facility to the drying and storage of the rice produced by plaintiffs during the 1974 crop year.

Plaintiffs claim that Southern Seed damaged their rice in the process of drying and storing the same; that Southern Seed allowed too much rice to be delivered to the facility resulting in an improper drying schedule and aeration of the rice; that Southern Seed failed to exercise proper temperature and moisture control and allowed excessive heat to develop, killing germination for the seed rice and lowering the grade and milling yield for the mill rice; that Southern Seed failed to reduce the moisture content to a safe level for storage; that Southern Seed improperly blended the rice. Plaintiffs claim that Southern Seed's failure to properly and adequately dry and store their rice caused them to receive a lower market price for their rice.

Southern Seed contends that the conditions of harvest and delivery of rice to its facility were under the exclusive control of plaintiffs; that the degree of maturity of the rice and its moisture content had a direct relationship to the quality of the rice, when dried. Southern Seed further contends that as each load of rice was delivered to its facility a written receipt was delivered to the agent of the plaintiff delivering the rice, setting forth thereon the date, the name of plaintiff from whom the rice was received, the moisture content of the rice when received, together with the printed weight ticket showing the number of bushels received. Each receipt contained a printed disclaimer of any warranty of the quality of rice when dried.

Southern Seed operated what is known as a "continuous flow" type drying facility; that is to say, as received, the rice was initially placed into a storage bin (which may or may not have been aerated), and later run through a drying cycle. This was known to all plaintiffs. In handling plaintiffs' rice, Southern Seed followed the customary trade practices and procedures of other operators using continuous flow facilities.

Southern Seed further contends that continuous flow drying facilities customarily reject rice delivered for drying with a moisture content of 21 per cent or above, because of the danger of deterioration in grade and milling yield, and because rice with a moisture content of 21 per cent or above is generally immature; that this policy applies in all such facilities serving the farming area in question, that exceptions are made only in cases of good customers or stockholders and then only for random loads which are taken at the owner's risk; that Southern Seed accepted plaintiffs' rice during the crop year in question with a moisture content in excess of 21 per cent in reliance upon the printed disclaimer on each receiving ticket; and that plaintiffs assumed the risk that rice delivered with a moisture content of 21 per cent or more would suffer a loss in grade and/or milling yield.

Southern Seed further contends that the rice harvested by James Baugh from the fields certified for production of seed rice, delivered to its facility, was immature when harvested, had excessive moisture content when delivered for drying, and that these factors, not under Southern Seed's control, materially affected germination and milling yields.

All of the rice of James Baugh involved in this litigation was sold as mill rice, 69,735.33 bushels dry weight sold for $3.558 per bushel; 22,884.44 bushels dry weight sold for $2.998 per bushel; and 16,394.66 bushels dry weight sold for $2.986 per bushel. James Baugh did not introduce evidence as to damages with reference to mill rice delivered by him to Southern Seed. He acknowledges in post-trial submissions that he must fail on this issue. As to seed rice, James Baugh claims damages for the improper drying and storage of the rice produced by him from fields certified for pro-

duction of Certified Bonnett No. 73 seed rice, in the sum of $187,664.90.[2]

All of the rice of Sebourn involved in this litigation was sold as mill rice for the price of $3.10 per bushel dry weight. Sebourn claims damages amounting to $59,730.50. The demand is based upon an asserted market price of $4.75 per bushel, the price the rice would have brought had the rice been properly dried and stored.

The rice of Harry Baugh involved in this litigation was sold as mill rice. The record reflects that 14,210.22 bushels dry weight were docked $1.56 per bushel for heat damage which Harry Baugh attributes to the negligence of Southern Seed. Based upon this fact, Sebourn claims damages of $22,167.94.

### E. Evidence Relative to Drying and Storage of Rice.

There are two areas of claimed damage to the rice of plaintiffs caused by the drying and storage practices of Southern Seed. First, there is claimed damage to the mill rice of plaintiffs by virtue of loss in grade and milling yield. Secondly, there is claimed damage to the seed rice of James Baugh by virtue of loss of germination.

The evidence reflects that rice must be conditioned for storage before it can be safely stored. This conditioning process is commonly known as drying. The purpose is to remove moisture from the rice and reduce its moisture content to a safe percentage. In the case of mill rice, a safe level is considered less than 13 per cent moisture content and less than 14 per cent is considered a safe level for seed rice.

Operators of rice drying and storage facilities, sometimes referred to as rice elevators, are charged with the responsibility of using the reasonable care of a prudent operator to reduce the moisture content of freshly harvested rice, sometimes referred to as green or wet rice, to a safe level prior to storage, and further to use reasonable and prudent practices in monitoring the stored rice to safeguard against heat build-up in storage. If the moisture is not reduced to a safe level promptly and the temperature properly monitored, then two conditions can occur which will adversely affect germination of seed rice and grade and milling yield of mill rice.

First, microorganisms which are present in all rice will multiply in rice stored from 90 degrees to 100 degrees temperature which has not had moisture properly reduced to below 14 per cent. In the case of rice delivered to the elevator with a moisture content above 21 per cent, the drying process should commence as soon as can be done by the exercise of reasonable care. Seed rice is first affected by allowing the microorganisms to multiply causing a loss of germination, but in time head yield of mill rice will also be adversely affected.

Secondly, the storage of rice with too much moisture will cause heat buildup resulting in loss of grade and lower head yield for mill rice. Customarily, drying and storage facilities have a temperature monitoring system affixed to each bin to warn the operator against heat buildup and some facilities have aerated bins to safeguard against heat buildup.

As above mentioned, Southern Seed operated what is known as a "continuous flow" drying system. This system contemplates that the green or wet rice will be placed in bins and moved from the bin through a dryer where heated air is passed over and through the stream of rice and returned to the bin for successive drying cycles until the moisture content has been reduced to a safe level. Southern Seed used what is known as "coring" to test for heat buildup in the bins.

The parties introduced a number of expert witnesses on the subject of planting, harvesting and artificial drying of combined

2. Computed on a loss of $2.15 per bushel on 87,286 bushels dry weight of seed rice. All seed rice was sold as mill rice, at an average of 3.35 per bushel. James Baugh contends Southern Seed contracted to buy this rice at 5.50 per bushel. The difference of 2.15 per bushel, he claimed represented the loss sustained because of the improper handling of the rice by Southern Seed.

rice. The court does not feel it necessary to discuss in detail the testimony of each of these witnesses.

A careful review of all of the evidence indicates certain basic findings. The delivery of rice by the producer to an elevator for drying and storage with a moisture content in excess of 21 per cent is hazardous. While rice can be safely processed at a higher moisture content, there are certain risks that must be considered. These facts are generally known and accepted by both the producer and the dryer.

The evidence in the actions sub judice, reflects that during the period October 10, 1974, through October 28, 1974, when the seed was delivered to Southern Seed by James Baugh, the moisture content of the rice ranged well above the 21 per cent level. The greatest portion of the mill rice received by Southern Seed during this period from the other two plaintiffs, Harry Baugh and Sebourn, was in excess of the 21 per cent moisture content.

The court finds that plaintiffs harvested their rice crops during the season in question with a higher moisture content than was reasonably prudent. The harvest was occasioned by a desire on the part of plaintiffs to deliver the rice to the elevator for drying and storage as early in the fall of the year as could be accomplished. Southern Seed's facility in its first year of operation was devoted almost entirely to the drying and storage of the crops produced by plaintiffs, and the facility through its owners exercised reasonable diligence to properly dry and store the rice received by it.

The circumstances surrounding the services to be rendered plaintiffs by Southern Seed were well known to plaintiffs. They knew the type of drying and storage facility operated by Southern Seed, and its limitations. Plaintiffs are charged with the knowledge common to all producers of the hazards encountered in the delivery of rice to Southern Seed with a moisture content of over 21 per cent. A warranty limitation appeared on the receipt issued by Southern Seed upon delivery of each load of seed. Plaintiffs are charged with notice thereof.

## II. CONCLUSIONS OF LAW

### A. *The Warranty Limitation.*

■ On every occasion when a load of rice was received at the elevator, Southern Seed completed and delivered to the driver of the truck, a receipt which contained the number of the receipt, the date of delivery, the name of the customer, the bushels of rice delivered, the variety of the rice, the moisture content of the rice, and the number of the bin into which the rice was placed. The receipt also contained the following printed matter:

Freshly harvested rice is a highly perishable commodity, and since Southern Seed Service can not control the conditions of the harvest and delivery to the dryer, green rice is received for drying with no warranty of specific quality of such rice when dry.

Southern Seed pleads the warranty limitation appearing on each receipt as a bar in the litigation. Plaintiffs argue that the limitation is not applicable since it does not comply with the provisions of Miss.Code 1972, Ann. § 75–7–204, which reads in pertinent part:

(1) A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances but unless otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care.

(2) Damages may be limited by a term in the warehouse receipt or storage agreement limiting the amount of liability in case of loss or damage, and setting forth a specific liability per article or item, or value per unit of weight, beyond which the warehouseman shall not be liable; provided, however, that such liability may on written request of the bailor at the time of signing such storage agreement or within a reasonable time after receipt of the warehouse receipt be increased on part or all of the goods there-

under, in which event increased rates may be charged based on such increased valuation, but that no such increase shall be permitted contrary to a lawful limitation of liability contained in the warehouseman's tariff, if any. No such limitation is effective with respect to the warehouseman's liability for conversion to his own use.

Subsection (1) of Section 75–7–204, fixes the degree of care by a warehouseman and to that extent is applicable to the action sub judice. It is apparent, however, that subsection (2) is not applicable here, where Southern Seed attempts to limit the warranty of specific quality of the rice after the drying process and not the limit of the amount of liability in case of loss or damage.

The court holds, however, the limitation of warranty of quality contained in the receipt is applicable to the extent of its terms. When each load of rice was received, the receipt of the elevator was issued reflecting receipt of the rice. The printed limitation on the receipt became a part of the contract under which the elevator received the rice. Plaintiffs argue that they had no knowledge of the limitation at the time of delivery and cannot be held amenable to its terms. There is some evidence to the contrary. Assuming arguendo, that plaintiffs did not have actual knowledge of the provision, constructive knowledge is established by the evidence. This is sufficient, in the opinion of the court, to bind plaintiffs.

The court's attention has not been called to any case which justified a holding that the parties were prohibited by the public policy of Mississippi from entering into such an understanding or that the limitation was an unreasonable exercise of the right of Southern Seed to limit the extent of its warranty of specific quality of rice received for drying and storage. Under such conditions, the limitations will be enforced in so far as applicable. *Cf. Smith v. Smith*, 375 So.2d 1041, 1042–43 (Miss.1979).

### B. *The Standard of Care.*

The court does not hold that the stated provision of the receipt relieves Southern Seed from performing the drying and storage services in a manner consistent with Southern Seed's duty to exercise reasonable care in drying and storing the rice. Section 75–7–204(1), *supra*, provides the standard of care applicable to this action. Southern Seed is liable for damages for injury to the subject rice, if such damages were "caused by [Southern Seed's] failure to exercise such care in regard to [the rice] as a reasonably careful man would exercise under like circumstances, but unless otherwise agreed [Southern Seed] is not liable for damages which could not have been avoided by the exercise of reasonable care".

The question presented is whether, under the circumstances which surrounded the parties, Southern Seed exercised the care which a reasonably careful man would have exercised, in accepting delivery of the rice, and undertaking to dry and store the rice with the means available by the use of the equipment at hand.

In considering the answer to be given to the question aforesaid, the court, as near as possible, must place itself in the position of the owners of Southern Seed. The crop year 1974 was the first year of operation for the elevator. Southern Seed had agreed to dry and store all seed rice produced by James Baugh and to purchase that which passed all germination tests for $5.50 per bushel, dry weight. The seed rice thus acquired would be the stock of seed rice which could be marketed during the next crop year through the seed rice sales of Southern Seed. The rice when harvested by plaintiffs had not fully matured and was delivered to Southern Seed with a moisture content in excess of that which was considered to be safe. This fact was known to James Baugh, Harry Baugh and Sebourn.

There is evidence in the action which supports the position of plaintiffs that rice with a moisture content of more than 21 per cent requires almost immediate scheduling for drying, and that on some occasions, Southern Seed did not begin the drying

process for as long as 48 hours; and in some cases for a period in excess of 48 hours. This evidence must be considered along with all the other evidence to determine the liability of Southern Seed, if any.

### III. CONCLUSION

#### A. *The Complaint.*

Southern Seed was not an insurer of the quality of the rice upon the drying and storing thereof. *Pope v. Andrews,* 361 So.2d 71, 72 (Miss.1978). The burden of proof is upon plaintiffs to show by a preponderance of the evidence that the rice was in good condition when delivered to Southern Seed. This they failed to do. *Pope v. Andrews, supra* at 72.

The burden of proof rests also on plaintiffs to show by a preponderance of the evidence that in accepting delivery of, drying and storing the rice, Southern Seed failed to exercise the care which a reasonably careful man would exercise under the circumstances. When considered in its entirety the evidence fails to meet this burden. The plaintiffs must fail in their actions.

#### B. *The Counterclaim.*

Southern Seed initially filed a counterclaim seeking damages from plaintiffs for securing the release of the rice without tendering the charges for drying and storage of the rice. In the early stages of the litigation, the court directed Southern Seed to release the rice in order that it might be sold on the market. The order was conditioned upon plaintiffs paying into the registry of the court an amount of money to satisfy the charges should plaintiffs action be unsuccessful. The money was held by the clerk until defendants made a personal bond for its release. Southern Seed claims this action by the court was unwarranted and resulted in severe economic loss to it in its business affairs.

During the pendency of the actions, Charles H. Smith and James Baugh became entangled in certain litigation in the United States Court for the Eastern District of Arkansas. Charles H. Smith sought the determination in that action of a claim against James Baugh for supplies and related charges growing out of a landlord-tenant relationship which existed between them. The court refused to entertain the dispute. When this occurred, the counterclaim was amended so as to submit the controversy to this court in the pending actions. This latter controversy has been resolved, and is the subject of a final judgment rendered on a previous occasion. The court is not now concerned with this issue.

Southern Seed has the burden of proving by a preponderance of the evidence that the court's former action in directing the release from storage of the rice was not proper under the conditions outlined in the court's order directing such to be done. The court has considered all the evidence produced by the parties, the circumstances existing at the time of the entry of the order of release, the economic problems facing Southern Seed at the time, and finds that Southern Seed has not met that burden. Additionally, Southern Seed has not shown with reasonable certainty what damages, if any, Southern Seed is entitled to recover. The counterclaim must be dismissed on the merits.

The clerk is directed to enter final judgment in each of the actions consolidated herein, denying each plaintiff any recovery on the complaint against defendants Charles H. Smith and Charles F. Smith, d/b/a Southern Seed Service, and a final judgment on the original counterclaim in each action denying defendants, Charles H. Smith and Charles F. Smith, d/b/a Southern Seed Service any recovery thereon, the parties in each instance to bear his own costs.